## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**CARMEN M. CASTILLO-VEGA**,
    Plaintiff,

v.

**COMMISSIONER OF SOCIAL SECURITY**,
    Defendant.

Civil No. 19-1244 (BJM)

### OPINION & ORDER

Carmen M. Castillo-Vega ("Castillo") seeks review of the Social Security Administration Commissioner's ("the Commissioner's") finding that she is not entitled to benefits under the Social Security Act ("the Act"), 42 U.S.C. § 423. Castillo argues that the administrative law judge ("the ALJ") should have found that Castillo's limitations were more severe when considering her mental limitations under Social Security Listing 12.04 and that the ALJ's residual functional capacity ("RFC") determination was flawed for a variety of reasons. Docket No. ("Dkt.") 32. The Commissioner opposed. Dkt. 37. This case is before me by consent of the parties. Dkts. 17, 18, 20, 21. For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

### APPLICABLE LEGAL STANDARDS

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Sec'y of Health & Hum. Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters

entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Sec'y of Health & Hum. Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence means "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Sec'y of Health & Hum. Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; see *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Goodermote v. Sec'y of Health & Hum. Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At Step One, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At Step Two, the Commissioner determines whether the claimant has a medically severe impairment or combination

of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At Step Three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in Appendix 1 of the regulations, impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to Step Four, at which point the ALJ assesses the claimant's RFC and determines whether the claimant's impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final Step asks whether the claimant can perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At Steps One through Four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Rodríguez v. Sec'y of Health & Hum. Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under Step Five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Sec'y of Health & Hum. Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Sec'y of Health & Hum. Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

### A.  Medical Summary

The following facts are drawn from the transcript ("Tr.") of the record of proceedings at Dkt. 23. Although I have reviewed the entire record, I only include portions of the record that are relevant to Castillo's claim on appeal.

Castillo's date of birth is June 6, 1961. Tr. 275. She had previously worked at a daycare for twelve years as a childcare attendant. Tr. 279, 294. She has a high school education but is unable to communicate in English. Tr. 264.

On August 26, 2013, Castillo saw Dr. Jose Ruiz-Rivera ("Dr. Ruiz"), apparently for pain in the left side of her pelvis (though the notes in this section are somewhat unclear). Tr. 326, 622. He noted that her father had had heart disease and that there was thyroid disease in her family from her mother, her sibling or siblings, and her child or children. *Id*. He also noted that she was a homemaker, that she had no family problems, and that she did not have a history of depression. *Id*. However, she had difficulty falling asleep and staying asleep. Tr. 327, 623. He also found that she had no pain upon palpitation. *Id*. Dr. Ruiz made a plan for Castillo to undergo metabolic testing and a lipid panel as well as for her to see a gynecologist, among other things, and may have assessed her as having a urinary tract infection or UTI. *Id*. Blood test, metabolic panel, lipid panel, urinalysis, and other results obtained from samples taken from Castillo on August 27, 2013 showed no obvious abnormalities. Tr. 633-37.

On September 13, 2013, Castillo visited Dr. Ruiz for pain in her lower back that was radiating to her legs. Tr. 331, 627. She denied experiencing physical trauma or chest pain. *Id*. Dr. Ruiz diagnosed her as having lumbago after seemingly finding that she had pain on flexion and extension of her spine. *Id*.

On October 16, 2013, Castillo saw Dr. Ruiz after having been evaluated in the emergency room. Tr. 330, 626. The reasons for her visiting the emergency room are unclear and parts of Dr. Ruiz's notes are illegible, but the only abnormal findings he made pertained to her cardiovascular system; he assessed her as having deep vein thrombosis, peripheral vascular disease, migraines, and (perhaps) varicose veins, though this portion of Dr. Ruiz's notes is partially illegible. *Id*.

On November 15, 2013, Castillo saw psychiatrist Dr. Ibzan Perez-Munoz ("Dr. Perez"), claiming that nothing made her happy and that everything annoyed her (seemingly noting that this was probably the result of her having been unemployed for two years, though Dr. Perez's notes on this point are partially illegible). Tr. 343, 639. She presented with no suicidal ideation. *Id*. Castillo saw Dr. Perez again on January 16, 2014, at which time Castillo noted that she had increased pain in her back, that everything was still annoying her, that she was experiencing anger, that she had no desires or sexual desire, and that she was sad, but that she had no ideas of death. *Id*. Dr. Perez also made illegible notes. On February 18, 2014, they saw each other again, at which time Dr. Perez noted that Castillo claimed that she was fighting a lot, had a lower tolerance level, did not go out, ate all day, did not want to be around people, did not want to do anything, had ideas of death, heard voices, and saw things in shadows, but he also noted that she was coherent. Tr. 344, 640. Parts of this portion of the record are again illegible. On March 18, 2014 or thereabouts, they saw each other yet again, at which time Dr. Perez noted claims of decreased tolerance, sadness, tiredness, hearing voices, forgetfulness, anxiety, fear, and pain, stating that Castillo said she was sitting all day, did not want to see people, repeated things, and might be experiencing side effects from something. Tr. 345, 641. Again, parts of this portion of the record are illegible.

On April 21, 2014, Castillo filled out a disability report with the assistance of an attorney. Tr. 557. She claimed to suffer from an emotional condition, muscle aches, and pain. *Id*. She stated

that she had stopped working on June 6, 2011, due to her conditions. *Id.* However, she also claimed that her conditions did not cause her to make changes in her work activity. Tr. 558. She claimed to be taking medicines including Fluoxetine, Quetiapine, and Venlafaxine that had been prescribed to her by Dr. Perez. Tr. 559.

On April 29, 2014, Castillo again saw Dr. Perez, who noted that she claimed to have side effects to something; that she claimed to be sad, forgetful, angry, easily annoyed, possessing low tolerance, and lethargic; that she gave inadequate answers; and that she came off as very serious and sad with an intense affect. Tr. 346, 642.

On May 12, 2014 (or thereabouts), Castillo saw Dr. Ruiz for lower back pain radiating to her leg as well as knee pain. Tr. 329, 625. She denied having experienced any physical trauma or fall. *Id.* Dr. Ruiz assessed her as having knee pain and lumbago. *Id.*

On May 14, 2014, Dr. Carlos Nassar performed lumbosacral spine AP and lateral x-rays as well as knee AP and lateral x-rays on Castillo. Tr. 628. The x-rays displayed no bone or joint abnormalities in the knees, showed that Castillo's vertebral body heights and disc space heights were well-preserved, and displayed mild curvature in her spine's alignment. *Id.* On the same date, Castillo had hematology and coagulation tests performed, but her results were adequate and her only slightly abnormal results appear to have been a slightly elevated mean platelet volume and a slightly elevated lymphocyte level. Tr. 629. A urinalysis performed on the same date yielded no obviously abnormal results. Tr. 630. A basic metabolic panel performed on the same day showed no abnormalities and a lipid panel showed low high-density lipoprotein levels but no other abnormal results. Tr. 631.

On May 21, 2014, Castillo saw Dr. Ruiz again for pain in her throat and a cough. Tr. 328, 624. She denied having chest pain and had no fever. *Id.* All of her findings were within normal

limits except for her ear, nose, and throat plus mouth category, and Dr. Ruiz assessed her as having an upper respiratory tract infection. *Id*. Dr. Ruiz also noted that Castillo had had knee x rays taken but the results were normal. *Id*.

On May 29, 2014, Castillo saw Dr. Perez yet again, who noted that she had started sleeping with the lights on; that she complained of dry mouth and skin issues; that she had a bad mood and was fearful with little appetite, hearing voices; and that she again was supposedly experiencing side effects to something. Tr. 346, 642. Notes in this section are partially illegible.

On June 18, 2014, Castillo saw psychologist Dr. Angel Egozcue for a mental health status psychological examination upon referral from the Social Security Disability Determination Program due to her pending claim. Tr. 646. She stated that she had worked at a nursery that had closed, and although she had tried to find other work she was unable to do so, leading to her becoming isolated, depressed, and spending more time at home not wanting to go out or engage in any activities. Tr. 647. Her emotional symptoms reportedly included depression, anxiety, and psychosis; she denied engaging in activities like household chores (though she claimed to start them, she would not finish them), and she took Seroquel, Effexor, and Prozac as prescribed by her psychiatrist. *Id*. Dr. Egozcue stated that Castillo suffered from no medical conditions. *Id*. She had no reported family history of mental health conditions or suicide attempts, no history of alcohol or drug abuse, and no history of legal difficulties. Tr. 648. She reported living with her husband and adult son; claimed to attempt to help her husband in small chores but not to finish them; said she did not do her own grocery shopping, laundry, or cooking; said she would bathe herself and clean her hair when prompted; displayed inadequate initiative and persistence to perform tasks according to her condition; apparently did not handle her own funds; and did not participate in social activities or interactions. *Id*. Her previous work relationships were reportedly good. *Id*.

Castillo was apparently not interested in her physical appearance and appeared appropriately dressed but somewhat unkempt; she was well-connected to the interview and followed the conversation appropriately; and she showed appropriate posture during the interview. *Id*. She appeared calm, depressed, did not smile appropriately, readily cooperated when asked questions, did not make adequate eye contact, displayed normal psychomotor activity when walking, and did not present with any unusual features like tremors or slow, repetitive, or involuntary movements. Tr. 648-49. Her mood and affect were depressed; her range was flat; her speech was logical, relevant, and coherent; she spoke in a monotone; the quality of her speech was minimal; she was not spontaneous during the interview and conversation did not flow freely; and she established poor rapport with Dr. Egozcue. Tr. 649.

Castillo did not present any signs of paranoid ideation, delusional or distorted thinking, unreasonable beliefs, obsessive thinking, highly irrelevant comments, excessive vagueness, frequent changes of topic, nonsense words, or halted speech during the interview. *Id*. However, she did claim to be ill-tempered, display sometimes aggressive behavior, self-harm, be suicidal at times (but without attempts), and have auditory and visual psychotic experiences. *Id*. Castillo's speech was clear and relevant. *Id*. She did not present as having dissociative symptoms or depersonalization, nor did she seem to have illusionary material experiences, and although she claimed to have visual and auditory hallucinations, they did not give her commands or tell her what to do. *Id*. She was well-oriented in person, place, and time; had poor immediate memory and was only able to repeat two out of five words given to her; had poor short-term memory and was only able to remember the same two words out of the five after five minutes; had moderate recent memory, being able to describe how she got to the office and partially remember activities she performed the day before; had moderate long-term memory, failing to remember many details like

when she finished work but recalling some details from her childhood; and appeared to have a poorly sustained attention level as well as an ability to concentrate, only being able to say some of the months of the year and able to spell a word in Spanish forwards but not backwards. Tr. 649-50. Her general knowledge was less than what would be expected at her chronological age given her academic background and experiences; she could not name the current governor of Puerto Rico, say how many years took place between votes, was unable to state similarities between a car and a boat, was unable to interpret a Spanish phrase, could not perform simple arithmetic, and was unable to describe current social events and happenings. Tr. 650. However, she displayed knowledge of Puerto Rico's capital and could state the similarities between a dog and a cat. *Id*. Her social judgment appeared to be inadequate; Dr. Egozcue deemed her insight poor but her general judgment to be adequate. *Id*.

Dr. Egozcue ultimately diagnosed Castillo with schizoaffective disorder and said she had a moderate impairment in occupational functioning, finding that her mental prognosis was guarded. *Id*. He believed that Castillo was showing moderate symptoms of a reactive depression, which he noted was quite common in cases where a person is laid off later in life and is unable to obtain other employment. *Id*. However, Dr. Egozcue said that he had trouble believing that Castillo would actually be so incapacitated that she would not do anything all day on a constant basis, stating that Castillo may be exaggerating this point, particularly considering that her medication seemed to be a maintenance one and that she had never been hospitalized, which would suggest that she is on the proper maintenance dosage. Tr. 651. However, Dr. Egozcue nonetheless concluded that Castillo clearly had an actual moderate level of a major depression which at a time was quite severe. *Id*. He noted that she showed poor motivation, inadequate insight, and inadequate social interactions (though he noted that this last point was difficult to believe), but stated that she

could handle her own funds, said that she did not require daily supervision, and found that she could make decisions and watch out for her own personal security. *Id*.

On July 2, 2014, Castillo saw Dr. Perez again, reporting that she had no appetite and spent all day at home; that she had dry mouth, drowsiness, and a bad mood; that everything annoyed her, she was forgetful, and she had no desire to get ready or dressed for things; that she did not receive visitors; and that she still heard voices. Tr. 349, 645. Other notes made by Dr. Perez that day are illegible. On August 15, 2014, they saw each other again, at which time Dr. Perez noted that she reported being forgetful; that she got annoyed easily; that she still heard voices and was drowsy; and that she had anxiety and itching. Tr. 366, 681.

On August 25, 2014, Dr. Roberto Hau Rosa ("Dr. Hau") performed a musculoskeletal evaluation on Castillo. Tr. 654. Dr. Hau noted that Castillo walked without an assistive device and without limping. *Id*. Castillo complained of an emotional condition for the last eight months without a history of institutionalization or hospitalization; she also complained of muscle aches in her shoulders and lower extremities lasting for a long time, but Dr. Hau noted that her doctor had ordered no treatment for this condition. Tr. 655. Castillo also complained of pain elsewhere and Dr. Hau noted that she was under treatment with Flexeril and Anaprox, but that those medications were not prescribed to her by a doctor. *Id*. Castillo reported to being able to take care of all her own hygiene matters and to be fully mobile indoors, including taking stairs, except for dressing (which her husband helped her with); she also was apparently able to handle her own medical care, money management, phone calls, travel (as a passenger), shopping (with company), some food preparation, some housework, and walking outdoors, though she apparently never drove. *Id*. She took Quetiapine, Fluoxetine, and Effexor ER. *Id*. She had episodes of headaches and episodes of

blurry vision, some pain on the back of her neck, pain on her shoulders and legs, numbness in her hands when grooming, and sleep disorders that her medications did not help. Tr. 655-56.

Dr. Hau found that she was awake, active, alert, and oriented in person, place, and time; he noted that her hygiene was adequate, that she showed no signs of visual or audible deficit, and that she could stand from a chair and from the examination table without difficulty. Tr. 656. He also found that she had an absence of Gower's sign, that she displayed no ankylosis of her extremities, that she did not display any anxiety, agitation, or masked facie, and that she followed instructions adequately. *Id*. She displayed good eye contact and coherent communication. *Id*. She showed no aphasia, apraxia, or agnosia, and her speech had adequate fluency and repetition; her cranial nerves were also normal. *Id*.

Dr. Hau found that Castillo tended to exaggerate the limitation of movement in her neck, noting that there was no thrill, an absence of cervical rigidity, and a negative Spurling's Test. *Id*. Her thorax, lung, and heart findings were normal. Tr. 656-57. Her extremities were all normal as well, as were her knee examinations. Tr. 657. Castillo displayed minimal tenderness at palpation of her mid-paravertebral muscles, but displayed no signs of scoliosis, kyphoscoliosis, kyphosis, or lordosis. *Id*. Dr. Hau again found that Castillo exaggerated her supposed limitations when it came to range of motion in her back; he noted that she could sit with a straight back up from a flexion position without difficulty, that she could sit on a chair at 90 degrees without difficulty, that Gower's sign was absent, and that she could arise from her chair without signs of difficulty. *Id*.

Castillo was oriented in time and space; she displayed no deficit in her cranial nerves; her speech displayed adequate fluency, repetition, and comprehension; her writing was adequate without hand tremor; her station and gait were within normal limits; she had no lateral pulsion, anteropulsion, or retropulsion signs; she had no dystonic movements; her muscle stretch reflexes

across her body were average; and she had adequate heel and toe ambulation. Id. Her straight-leg raising tests were negative, her sensory exam was normal, and she had no fibromyalgia tender points, among other findings. Tr. 657-58. Dr. Hau's diagnostic impression was that Castillo had muscle spasms in her mid-back and some unspecified level of mental disease. Tr. 658. He found that she could perform her own self-care and personal hygiene, suggested that she could fully perform all standard communication and physical activities, implied that her sensory functions were fully intact, and suggested that she could perform normal hand activities. *Id*.

Regarding Castillo's gait, Dr. Hau found that it was normal, that her strength was five out of five at both extremities with no atrophy, and that generally she displayed no signs of neuro-muscular deficit when it came to ambulation. Tr. 659. He assessed her hands but found no limitations and normal functioning at full muscular strength with no signs of grip deficit. Tr. 660. He also assessed Castillo's range of motion, finding everything normal except that Castilo only went to 140 degrees with her knee flexion out of a standard 150 degrees and only went to 40 degrees with her back flexion out of a standard 90 degrees. However, as noted above Dr. Hau found that Castillo exaggerated her supposed limitations regarding range of motion in her back.

On September 1, 2014, Dr. Hau had lumbosacral and cervical spine AP and lateral x-rays performed on Castillo. Tr. 664. The x-rays showed normal alignment and height of vertebral bodies throughout the spine, well-preserved disc spaces in the lumbar spine, and prevertebral soft tissues within normal limits in the cervical spine, but mild to moderate spondylotic changes in the cervical spine and mild spondylotic changes in the lumbar spine. *Id*. Dr. Hau's impression was that Castillo had mild to moderate cervical spondylosis and mild lumbar spondylosis. *Id*.

On September 10, 2014, state agency consultative examiners Dr. Zulma Nieves and Dr. Cristina Ortiz released a determination in which they found that Castillo was not disabled. Tr. 426.

They proposed a mental RFC for simple tasks and a physical RFC for medium duties. Tr. 418. They also noted that Dr. Perez described Castillo's feelings and difficulties but did not perform a mental status exam or make any objective findings. *Id*. In analyzing Listing 12.04 for affective disorders, they made mostly moderate findings, but they appear to have applied a now outdated version of the listing. Tr. 419. They also found that Castillo had a severe spine disorder. Tr. 418-19. They noted that a credibility assessment regarding Castillo's complaints could not be completed at the time, as Castillo had not described how her medically determinable impairments affected her functionality. Tr. 420. Regarding her RFC, they found that she could occasionally lift or carry up to twenty-five pounds; frequently lift or carry up to twenty pounds; sit, stand or walk for about six hours of an eight-hour workday; and push or pull unlimitedly. Tr. 420-21. They noted that the exertional limitations they suggested for Castillo were based upon the September 1, 2014 finding that Castillo had mild to moderate spondylotic changes in the cervical spine and mild spondylotic changes in the lumbar spine; Dr. Hau's largely normal findings on August 25, 2014; and Dr. Ruiz's findings from May 2014 and September 2013. Tr. 421. They also said that Castillo should be limited to frequently climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; and occasionally climbing ladders, ropes, and scaffolds. *Id*. They found that she did not have manipulative, visual, communicative, or environmental limitations. *Id*.

The doctors went on to evaluate Castillo's mental RFC, concluding that her ability to understand and remember detailed instructions was moderately limited; however, they stated that she was still able to learn, understand, remember, and execute simple instructions. Tr. 422. They also concluded that her abilities to remember locations and work-like procedures as well as to understand and remember very short and simple instructions were not significantly limited. *Id*. They found that while her abilities to carry out detailed instructions and maintain attention and

concentration for extended periods were moderately limited as well as her ability to complete a normal workday without interruptions at a consistent pace, she was otherwise not significantly limited; they also noted that she retained the ability to carry out simple instructions, follow simple work-like procedures, make simple work-related decisions, and sustain attention for up to two hours, concluding that she could perform at a significant pace (in particular if she was engaged in simple and repetitive tasks). Tr. 423. Regarding social interactions, the doctors found that Castillo was moderately limited in her ability to interact appropriately with the general public, but not significantly limited in any other regard, commenting that she maintained the ability to relate in simple terms to others. *Id*. As to adaptation interactions, the doctors concluded that Castillo was moderately limited in her ability to respond appropriately to changes in the work setting and her ability to travel, but not in her ability to be aware of normal hazards and take appropriate precautions or her ability to set realistic goals or make plans independent of others, finding that she should be able to adjust to minor changes and demands within a familiar work setting. Tr. 423-24. In summarizing their findings, the doctors said that Castillo was able to follow conversation, had good posture, was calm, had normal psychomotor activity, had depressed mood, was not spontaneous, had self-harm ideas but without obsessive thinking, had fair memory (though her recent and remote memory were moderately affected), had poor attention, and had somewhat affected concentration; she also reported auditory and visual hallucinations, though none presented during their interview. Tr. 424. The doctors also noted that although the record suggested some severe symptoms, Castillo was excessively vague in her responses, and the medications she was taking reflected a maintenance dosage for a condition that was not particularly severe, raising issues as to her credibility; she had also never been hospitalized. *Id*. They noted that according to the record, Castillo was able to handle funds, required no daily supervision, was able to make her

own decisions, and could watch out for her own personal security. *Id*. They ultimately found that while Castillo had a sufficiently severe condition to impair her capacity to engage in complex and detailed tasks, she retained the necessary capacity to understand and carry out simple instructions. *Id*. The doctors concluded that Castillo could perform unskilled work at a medium level and that therefore she was not disabled. Tr. 425-26. On December 15, 2014, Dr. Eileen Zayas and Dr. Luis Umpierre affirmed the previous state agency consultative examiner opinion from September 10, 2014 as written. Tr. 428-44.

On September 15, 2014, Castillo saw Dr. Perez, claiming to not be well, to have dry mouth, to argue a lot with her husband, to hear annoying voices, to have lower tolerance, to be experiencing some sort of palpitations, to see shadows, to have no desires, to have low mood, to have low strength, to be forgetful, and to be restless. Tr. 367, 682. On October 24, 2014, they saw each other again, at which time Castillo reported feeling itching all over her body that she had difficulty tolerating, feeling no desires, and hearing voices. Tr. 368, 683. Other notes made by Dr. Perez over the course of these two appointments are illegible. It is worth noting here that over the course of her treatment, Dr. Perez prescribed Castillo a variety of medications, seemingly including Prozac, Proquel, and others. *See, e.g.*, Tr. 684-89.

On March 2, 2015, Dr. Perez noted that it seemed that everything annoyed Castillo; that she had insomnia, was argumentative, wanted to die, was forgetful, heard voices, did not feel like doing anything, and had decreased tolerance; that she did not go outside, could not tolerate noise, appeared exhausted and weak, ate mainly candy, did not visit others, had a worse home life than before, and did not get on with her neighbors; that she saw shadows and heard voices (that spoke to her and told her to kill herself), and had feelings of worthlessness; and seemed coherent and relevant. Tr. 381, 701. On April 3, Castillo told Dr. Perez that she had dry mouth and little appetite;

she argued, didn't go outside, was exhausted (spending all day in bed), and hallucinated; there were always things annoying her and she never did anything; she heard voices and noises that annoyed her; she felt ignored at times at home; she ate only light meals and had lost weight; she heard people calling her when trying to sleep and saw shadows; and she was sad and angry, having issues with the neighbors. Tr. 379, 699. On April 30, she reported being forgetful, in a bad and low mood with dry throat and difficulty breathing; said everything annoyed her, she didn't want to be around other people, her own granddaughter made her nervous, and she could not tolerate noises; Dr. Perez said that she was coherent, serious, and seemed annoyed, and that she needed an antipsychotic. Tr. 380, 700. On June 1, Dr. Perez noted that she claimed to be always arguing, having a headache, spending every day sitting down, hearing voices or murmurs, wanting to be alone, being forgetful, having low mood, not feeling like doing anything, being easily annoyed, not going outside, and possibly hurting herself; however, he also said that she had no problems at home, that things were acceptable with the neighbors (although she believed that they talk about her, that she had a normal appetite, and that she sometimes received visitors. Tr. 382, 702. On August 3, Castillo reported itching on her neck, bad mood, anxiety, fear, worry that people were talking about her, spending the whole day at home, being annoyed by light, forgetting things immediately, exhaustion, dry mouth, hearing voices, seeing shadows, and believing her bed was being moved. Tr. 383, 703. On September 1, Castillo reported headache, bad mood, general annoyance, fatigue, low appetite, low tolerance for noise, sitting all day, decreased tolerance level, not wanting to go outside, forgetfulness, troubled mind, and side effects to medication. Tr. 384, 704. On November 2, Castillo seemed in a bad mood with anxiety, fear and restlessness, though she presented as coherent, relevant, and annoyed: she reported being afraid, hearing voices and murmurs, and wanting to sleep; hopelessness; decreased tolerance with forgetfulness, tiredness,

insomnia, and low appetite; not visiting people but receiving some visitors; and seeing shadows. Tr. 385, 705. All of Dr. Perez's notes over this timeframe had some illegible portions.

On January 12, 2016, Castillo reported arguing to Dr. Perez and was in a bad mood; she also reported decreased tolerance; not listening to others; seeing shadows, being forgetful, not cooking well, hearing voices, being annoyed by noises, and lacking interest in anything; dry mouth with tingling; constant fear, restlessness, wanting to be alone, and not sleeping much; eating candy; and having no ideas of death. Tr. 386, 706. She apparently came off as coherent, relevant, annoyed, and serious. *Id*. On March 14, things were "not good"; Castillo reported headaches, hardly sleeping, hearing voices, being annoyed by everything, feeling weak, being affected by noise, irritability, anger, no tolerance for others, seeing shadows, having ideas of death, visits from her mother, and trouble maintaining her weight, and she apparently came off as coherent, relevant, and angry. Tr. 387, 707. On May 13, things were "bad"; Castillo reported being in a bad mood, not liking going out, headaches, anxiety, low tolerance, not doing anything at home, exploding easily, hearing voices and seeing shadows, having dry mouth and no desires, and sadness, and came off as coherent, relevant and sad. Tr. 388, 708. On July 15, Castillo reported crying, no desire, being annoyed easily, low mood, low tolerance, hearing voices, forgetfulness, apathy, no desire to dress up, bad mood, insomnia, losing weight, lack of pleasure, thoughts that she might hurt someone, sadness, seeing shadows, not going out, not seeing the neighbors, not taking visitors, anxiety, and low tolerance of noise; she seemed coherent, relevant, serious, and annoyed. Tr. 389, 709. On September 16 or thereabouts (perhaps around a year later; however, the date appears to be misstated), Castillo reported hearing voices, becoming nervous at noise, tiredness, disorientation, not sleeping well, anger, low tolerance, losing her balance, nervousness around fast drivers, seeing shadows, sadness, ideas of death, frustration with her daughter, anxiety, and not

going outside; she seemed coherent, relevant, serious, and annoyed. Tr. 393, 713. On November 15, Castillo had been sick with flu, which had an effect on her; she reported not speaking to anyone, spending all of her time at home, not sleeping well, losing weight, taking naps, not experiencing pleasure, not doing anything, being visited by her daughter but not visiting anyone, thoughts that someone or something is going to harm her, sadness, hearing voices, and seeing shadows; she came off as coherent, relevant, serious, and annoyed. Tr. 394, 714. All of Dr. Perez's notes over this timeframe yet again had illegible portions.

On January 30, 2017, Castillo reported to Dr. Perez that she was experiencing crying, nervousness, pensiveness, sadness, dislike of people visiting, not liking going out, regular sleep but waking up during the night, napping, normal appetite, decreased tolerance, not seeing anyone or going out (except for her daughter visiting), hearing voices telling her to argue, seeing shadows, wanting to die at times, not experiencing pleasure, and anxiety; she seemed coherent, relevant, and sad, and was crying during the interview. Tr. 395, 715. On March 28, Castillo reported bad mood, increased pain, low tolerance of the people around her at doctor appointments, attacks where she found it hard to breathe, low tolerance of noise, forgetfulness, lack of pleasure, lack of appetite, not going out but receiving visitors (whose questions annoyed her), low tolerance generally, hearing voices, seeing shadows, having ideas of death, sadness, and general annoyance; she presented as coherent, relevant, annoyed, and serious. Tr. 396, 716. On May 29, she reported having a headache, not being able to breathe, having a chest scare, being irritable, not eating much, not going out, sleeping with the light on, having her husband do the household chores, not having much appetite, not experiencing pleasure, having ideas of death, thinking that someone is coming to harm her, and not sleeping well; she presented as coherent. Tr. 397, 717.

On June 6, 2017, Dr. Perez filled out a psychiatric report regarding his evaluation and treatment of Castillo. Tr. 398, 727. He noted that Castillo had no history of mental affectation until 2010, when she apparently felt overwhelmed, down, sad, and low with no energy, deciding to leave her job (which she had supposedly identified as the cause of her mental conditions). *Id*. However, she reportedly felt the same after leaving her job. *Id*. Dr. Perez claimed that although Castillo had had psychiatric treatment since 2013 with different antidepressants and antipsychotics, there had been no improvement in her condition of any kind. *Id*. Her complaints were episodes of crying, arguing a lot, not spending time with anyone, being exhausted with no energy, not wanting to go out, insomnia, sadness, no desire to do anything, not experiencing pleasure, feeling a sense of obligation, forgetfulness, inability to concentrate, lots of anger, a belief that others are talking about her, low tolerance, ideas of death, lack of sexual desire, hearing voices, seeing shadows, disorientation regarding time, anxiety, and ideas of worthlessness. Tr. 398-99, 727-28.

Dr. Perez noted that Castillo appeared athletic, that her BMI was acceptable, that she had no congenital or acquired defects, that she did not wear makeup or jewelry, that she dressed casually and had a low level of grooming, and that she had no tics or other obviously odd behaviors. Tr. 399, 728. Her volume of speech was normal and her articulation was clear, but her visual behavior was less apt, though her affect was adequate. *Id*. Her mood was serious, sad, depressed, worried, and frustrated; her thought process was coherent, relevant, and focused; her general, personal, and social judgment were all low; her intellectual level was acceptable for her education level; she had some auditory and visual misperceptions; and she had ideas of death. Tr. 400, 729. Her attention level was low; her concentration was low; her remote and recent memory was conserved, but her immediate memory was low; she had full orientation as to person and place, but her orientation as to time was only partial; and she only performed one out of ten on a variety

of different tests given to her by Dr. Perez. Tr. 400-01, 729-30. She did not present with illusions, paranoid ideas, or a history of use of drugs or illegal substances, but Dr. Perez said that she had a poor general functional ability, work ability, work prognosis, and level of tolerance, as well as diminished social judgment, no attendance of social or family activities, and a history of panic. Tr. 401, 730. She had no short, medium, or long-term goals and did not participate in her neighborhood or community. Tr. 402, 731. Her family environment was tense, her relationship with her spouse was tense, her relationship with her children was bad, she had no ability for rehabilitation, and she was only able to exercise or develop few abstract thoughts. Tr. 403, 732.

Dr. Perez acknowledged that the source of the information in therapy was Castillo herself. Tr. 404, 733. He nonetheless diagnosed her with chronic severe major depression with psychotic features, high blood pressure, hypothyroidism, pain in her vertebral column, and physical and emotional disability. *Id*. He said that Castillo's only stressor was pressure in the work environment and that any areas outside of the work environment were fine; he then went on to state that although Castillo was actively receiving psychiatric treatment and though she had undergone different methods of therapy with antidepressant regimens, she had not shown improvement of any kind, making her prognosis poor. *Id*. Dr. Perez concluded that from a psychiatric point of view, Castillo was disabled. *Id*. He also noted that she was taking Cymbalta, Effexor, Desipramine, Xanax, and Invega. *Id*.

On June 15, 2017, Dr. Ruiz filled out a general medical report for Social Security purposes in which he noted that the first examination he had performed on Castillo was on September 13, 2013. Tr. 735. He noted that at that visit, she had displayed signs of chronic low back pain, and that he had found at other times that she had bursitis and chronic tension-type headaches. *Id*. He also noted that she had dizzy spells but did not explain this further. *Id*. Her respiration was

apparently normal, as was her heart and circulation. Tr. 735-36. Castillo had not complained of chest pain, she did not have abdominal issues, and she did not have neurological issues (her speech, reflexes, motor system, and sensory system deemed to be normal). Tr. 736. Dr. Ruiz claimed that Castillo did have some limitation of movement when it came to the flexion and extension of her back, but said that she had no deformities, no inflammation, no fractures, no edema or trophic changes, and no pulsations. *Id.* Castillo apparently sometimes felt depressed and had a history of cancer. Tr. 736-37. She also apparently had a mild response to non-steroidal antiinflammatory drugs and muscle relaxants that she took for lumbago. Tr. 737. Dr. Ruiz diagnosed her with hypothyroidism, chronic tension headaches, high cholesterol, bursitis, cervicalgia, and chronic lumbago, stating that her prognosis was guarded. *Id.*

## B. ALJ Hearing

The ALJ held a hearing for Castillo on June 19, 2017. Tr. 255. Castillo testified that she could no longer work because her medications made her sleepy, she felt weak and tired, she liked to be alone and did not like to be surrounded by people, and she did not have any desire to go out. Tr. 280. She stated that she could not understand, read, or speak English. *Id.* She said she spent the day lying down or sitting, noting that she lived with her husband. *Id.* Castillo claimed she used to perform household chores, but she no longer did because she was too forgetful. Tr. 281. She said she no longer went anywhere and that she had not done so for around four years. Tr. 281-82. She believed she could lift twenty pounds but not thirty-five pounds. Tr. 282. She also testified that her back sometimes hurt and that she took muscle relaxers and pain medication for her bodily conditions. Tr. 282-83. She had never possessed a driver's license. Tr. 283. She intimated that family would sometimes come to visit her, but that her relationship with them was not good and she did not like to talk to them or ask them questions. *Id.* She also said that things were quiet

between her and her husband and she would only talk to him if he asked her a question; she said that she would get bothered a lot if he asked her the same question more than once. *Id*. She testified that her medications made her sleepy, tired, and nervous, and that even though she had talked to her doctors about changing her doses, the same thing always occurred. Tr. 284. She stated that her mental symptoms included hearing voices, not liking to go out, forgetting to do things, being bothered by noises like children playing, not liking being asked to do many things, and not liking to be close to people. Tr. 285. She stated that she experienced wrist pain at a level of eight or nine (presumably out of ten) almost all of the time and that she sometimes received injections at the hospital for the pain. *Id*. She also said her concentration was bad and that when she set out to find something she would often forget what she was looking for. Tr. 286. She noted she had never been hospitalized. *Id*.

Medical examiner Dr. Hernandez testified that he did not believe that Castillo met any of the physical allegations that would make her disabled. Tr. 288. He noted that she suffered from chronic lumbar pain, other body pain, and muscle aches; he also referenced the fact that she took Anaprox and Flexeril. *Id*. He stated her August 25, 2014 neurological examination with Dr. Hau that was completely normal signaled she had no motor deficits, sensory deficits, or tender points, although he did note that her flexion movement arc with her spine was limited to 40 when the normal number would be 90, though her extension and lateral flex were normal. *Id*. He also noted that her x-ray was completely normal, although an x-ray taken on September 1, 2014 showed that she had light arthritis at the lumbar level and other moderate arthritis findings. Tr. 289. Dr. Hernandez went on to say that Castillo's family doctor (Dr. Ruiz) did not mention her lumber pain on July 15, 2017, that Dr. Ruiz also noted that Castillo did not have sensory deficits or motor deficits after a neurological exam, that he found that she had normal reflexes but that she had very

similar limitations when it came to flexion as Dr. Hau had found. *Id*. Dr. Ruiz also noted that Castillo had developed hypothyroidism, that she suffered from tension headaches, that she had elevated cholesterol, and that she mostly suffered from lumbago and cervical pain, or muscle pains. *Id*. Dr. Hernandez noted that he had only had a limited time to review a lab from May 30, 2017 before the hearing, but that it showed that her white blood cell count, cholesterol, and sedimentation rate were slightly elevated, but that her thyroid and her urine test and culture were completely normal. Tr. 290. Her other results were apparently normal except for a positive result on an antinuclear antibodies test; however, the result was not far outside of the normal range and did not appear to be particularly unusual for individuals of Castillo's age. *Id*. Dr. Hernandez then found that in light of all the evidence, Castillo would not have any severe physical limitations or effort limitations. Tr. 291.

The Vocational Expert ("VE") and the ALJ then clarified that Castillo's previous job as a childcare attendant required a "medium" physical effort and was a semi-skilled job. Tr. 294. The VE testified that a hypothetical person with Castillo's supposed limitations could not perform Castillo's past work. Tr. 294-95. The VE went on to testify that a person with those limitations and Castillo's background, age, and other characteristics could not perform any other job that existed in significant numbers in the national economy because Castillo's previous job did not offer transfer of skills, she had no education that would allow her to enter directly into a skilled job, and she was of advanced age at 56 years old. Tr. 295. However, the ALJ told the VE that he was overstepping his role by "applying the grids," at which point the VE testified that a person with Castillo's purported limitations could work as a kitchen helper, a hand packager, or a salvage laborer, all jobs that exist in significant numbers in the national economy. Tr. 295-96. The VE also stated that such an individual could perform these jobs even if she was with supervisors,

coworkers, and the public in the course of her work occasionally, but that she could not perform

them if she could only maintain attention or concentration on the work for only six out of eight

hours of the workday. Tr. 296-97. However, the VE said that if the person had the concentration

and attention to perform repetitive unskilled tasks, they would be able to perform the work. Tr.

297.

### C.  ALJ Opinion

The ALJ issued his opinion on August 2, 2017. Tr. 266. The ALJ found that Castillo last

met the insured status requirements of the Social Security Act on December 31, 2016. Tr. 257. The

ALJ also found that Castillo had not engaged in substantial gainful activity from her alleged onset

date of June 6, 2011 through her date last insured. Tr. 258. The ALJ then determined that Castillo

had the severe impairment of major depressive disorder. *Id*.

The ALJ noted that Castillo had also been diagnosed with degenerative disc disease of the

cervical and lumbar spine, but found that the condition was non-severe since it had imposed no

limitations on Castillo's ability to perform work-related activities. *Id*. In support of this notion, the

ALJ noted that although Dr. Ruiz had found that Castillo occasionally had lower back pain that

radiated to her left leg, she had well-preserved vertebral body heights and disc spaces with only

mild curved alignment, Dr. Ruiz described her reflexes as normal, and he did not find that Castillo

had any motor or sensory deficits. *Id*. The ALJ also noted that although Dr. Ruiz alleged that

Castillo had limitations in the flexion and extension of her lower back, Dr. Ruiz did not quantify

these limitations; moreover, although Dr. Ruiz said that Castillo suffered from chronic lumbago

and cervicalgia, describing her prognosis as "guarded," the ALJ afforded his opinion and diagnoses

little weight because they were not supported by any treatment notes, because Castillo had visited

him only twice for cervical and lumbar pain despite alleging that she had a severe musculoskeletal

condition with severe pain, and because the only radiological studies on file for Castillo showed merely mild arthritic changes, mild lumbar spondylosis, and mild to moderate cervical spondylosis. *Id*. The ALJ also noted that Dr. Ruiz's opinion contrasted sharply with Dr. Hernandez's, which he afforded greater weight. *Id*.

The ALJ then stated that he gave significant weight to the opinion of consultative examiner Dr. Hau, who evaluated Castillo and found that despite muscle spasms, Castillo had no limitations when it came to writing, standing, reclining, walking, squatting, kneeling, grasping, gripping, pulling, or lifting. *Id*. The ALJ found this opinion consistent with the lack of longitudinal evidence on file regarding Castillo's purported conditions and with Dr. Hernandez's opinion, noting that Dr. Hau's examination findings that Castillo had intact sensory and motor symptoms, no neurological deficits, normal gait, 5/5 strength in her lower extremities, negative bilateral straight leg raise tests, and ability to rise from a sitting position without assistance also supported his opinion. *Id*.

The ALJ gave little weight to the opinions of state agency medical consultants Dr. Zayas and Dr. Ortiz, who said that Castillo's spine disorders were "severe" and limited her to a "medium" level of work, because they were not supported by any treatment notes, because Castillo only received sporadic treatment for her lower back without undergoing longitudinal treatment, and because radiological findings were mild and would not support exertional or postural limitations. Tr. 259.

The ALJ then noted that although Dr. Hernandez had testified that Castillo suffers from lumbar pain and Dr. Hau documented that she suffered from muscles aches, there were no treatment notes that supported these complaints. *Id*. He noted that Castillo had no tender points and was neurologically intact, and although she had some limitations in her range of motion, her

gait was normal. *Id*. He also noted again that Castillo's radiological studies from September 1, 2014 showed only mild to moderate arthritic changes in her lumbar and cervical spine. *Id*. The ALJ noted that Castillo also suffers from hypothyroidism, high cholesterol, and cervical strains.

The ALJ closed his analysis regarding whether Castillo had any severe physical impairments by noting that Dr. Hernandez's testimony was persuasive and entitled to great weight as to determining Castillo's RFC because Dr. Hernandez is a specialist familiar with Social Security policy and regulations, because he was able to review the complete documentary record, because he provided a detailed explanation for his opinion with references to evidence from the record, and because his opinion was supported by findings such as Castillo's mild radiological studies and other mild findings. *Id*.

The ALJ then found that Castillo did not have any impairment or combination of impairments that met or medically equalled the severity of a listed impairment. *Id*. The ALJ stated that he considered whether Castillo met or equalled Listing 12.04, but said that he did not believe that the medical evidence documents listing-level severity or that any acceptable medical source had mentioned making findings equivalent in severity to those necessary to make a 12.04 finding. Tr. 259-60. The ALJ considered the Paragraph B criteria for 12.04, noting that if Castillo had at least one severe or two marked limitations in the four areas considered under the Paragraph B criteria, then Castillo would meet the criteria; however, the ALJ found that Castillo had only moderate limitations across the board. Tr. 260. The ALJ noted that when it came to understanding, remembering, or applying information, Castillo admitted to being able to take care of her own medical appointments and manage her own funds, and that though she had displayed poor immediate and short-term memory in the consultative examination performed by Dr. Egozcue, she was also oriented in person, place, and time. *Id*. The ALJ also said that when it came to interacting

with others, Castillo admitted to Dr. Hau that she could go out shopping accompanied, though she told Dr. Egozcue that she did not engage in any social activities such as attending church or participating in any social interactions. *Id*. As to concentrating, persisting, and maintaining pace, the ALJ stated that Castillo admitted to Dr. Hau that she could manage her own funds, though she told Dr. Egozcue that this was not the case. *Id*. Regarding adapting or managing herself, the ALJ said that Castillo told Dr. Hau that she could bathe, use a phone, and perform some household chores and cooking, though she told Dr. Egozcue that she could not cook and that she would help her husband with light chores but sometimes would fail to finish them due to poor memory. *Id*. Since the ALJ found that Castillo's limitations were moderate in all these areas, the ALJ concluded that Castillo did not meet the Paragraph B criteria. *Id*. The ALJ also concluded that Castillo did not meet the Paragraph C criteria, but without providing any analysis. *Id*. Before proceeding, the ALJ also noted that his findings regarding Castillo's RFC reflected the degree of limitation that he found in the Paragraph B analysis as well, suggesting that his analysis of Paragraph B and his analysis of Castillo's RFC informed each other. Tr. 260-61.

The ALJ then stated that Castillo had the RFC to perform a full range of work at all exertional levels, but that mentally she was limited to understanding, remembering, and performing simple, routine tasks; was only able to make judgments regarding simple and routine work-related decisions; was only able to adapt to changes in simple and routine tasks within the work environment; and was able to interact frequently with coworkers but only occasionally with the public and supervisors. Tr. 261. He also noted that she was unable to communicate in English. *Id*. In support of these findings, the ALJ noted that although Castillo suffered from muscle aches from her cervical and lumbar spine, the evidence indicates that this had not caused her any limitation in her ability to work, while her mental condition was only moderate and had partially

responded to treatment. *Id*. The ALJ noted that Castillo had claimed that she was unable to look

for another job because her medications she had taken since 2014 made her sleepy and she did not

want to be around others, preferring to be isolated and lacking motivation to venture outside. Tr.

261-62. He also noted that she spent most of the day sitting or lying down, had house chores

performed by her husband, did not leave the house, could carry twenty pounds but not up to fifty,

and claimed to suffer from occasional back pain that she would treat with pain medication and

muscle relaxants. Tr. 262. The ALJ went on to reference other claims made by Castillo at the

hearing before the ALJ, including not having a good relationship with her family; annoyance at

repeated questioning; spending most of her time lying down because of her medications making

her sleepy and drowsy; having poor memory, hallucinations, tendencies to self-isolate, poor

interpersonal relations, poor tolerance of noise, irritability, and poor concentration; lumbar and

cervical pain at an eight to nine out of ten level most of the time; and visiting her primary care

physician approximately every two weeks. *Id*.

The ALJ then said that Castillo's claim hinged on whether she met Listing 12.04 or not,

but noted that although her mental impairment was severe and the evidence on file suggested that

Castillo had signs of depressed mood, anhedonia, sleep disturbances, psychomotor retardation,

decreased energy, difficulty concentrating, and hallucinations, she nonetheless did not meet the

Paragraph B criteria of 12.04. *Id*. The ALJ noted that she had been treated by Dr. Perez since

November 2013 and that he had documented the subjective symptoms of ill humor, sleepiness,

isolation tendencies, poor appetite, anxiety, irritability, poor hygiene, and poor memory, but that

he had treated her conservatively with medications like Prozac, Cymbalta, Risperdal, Geodon,

Wellbutrin, Seroquel, and Effexor. *Id*. The ALJ also noted that Dr. Perez consistently made

findings that she had coherent and relevant thought processes and maintained adequate affect. *Id*.

On June 6, 2017, the ALJ noted that Dr. Perez had found that Castillo was able to sustain visual and verbal contact and that her speech was clear and her affect was adequate; moreover, although she displayed sadness and depression with poor judgment, impaired attention and concentration, and self-reported visual and auditory hallucinations, her thought processes remained coherent, logical, and relevant. Tr. 262-63. The ALJ also found it important that although Castillo apparently also had impaired immediate memory, her remote and recent memory were preserved and she was oriented in person and place. Tr. 263. Dr. Perez's conclusion was that Castillo's ability to work and her ability to function within a work setting were both poor; he gave her a Global Assessment of Functioning ("GAF") score of 50 and diagnosed her with major depressive disorder, severe with psychotic features, concluding that she was disabled from a psychiatric standpoint. *Id*. However, the ALJ gave this opinion little weight, noting that it was not supported by any mental status examinations and that Dr. Perez's treatment notes were essentially comprised of subjective complaints documented by Dr. Perez rather than active findings. *Id*. The ALJ also noted that the course of treatment for Castillo was "not what one would expect" for a completely disabled person, mentioning that Dr. Perez never recommended any hospitalizations and that if Castillo's condition was as severe as Dr. Perez described it to be, then Castillo should have undergone more aggressive treatment. *Id*.

The ALJ also gave only partial weight to the diagnosis of schizoaffective disorder and GAF score of 52 given to Castillo by Dr. Egozcue. *Id*. The ALJ noted that this opinion was inconsistent with Dr. Egozcue's examination, noting that although Dr. Egozcue found that Castillo was depressed and presented with hallucinations, she still had logical, relevant, and coherent thought processes; had no reference issues or distorted thinking; presented with no dissociative symptoms; was oriented in person, place, and time despite having poor immediate and short-term memory as

well as poor attention and concentration; and displayed adequate judgment. *Id*. The ALJ also said that he afforded the opinion little weight because Dr. Egozcue reported that Castillo showed "moderate symptoms," which was inconsistent with a GAF score of 52. *Id*. He noted that Dr. Egozcue had also found that despite Castillo having poor motivation and inadequate concentration and memory skills, she nonetheless was able to handle her own funds, did not require daily supervision, and was able to make decisions and take care of her own personal security. *Id*. The ALJ stated that since Castillo was on a maintenance psychiatric medication for severe depression but never needed to be hospitalized, this suggested that her medication was at the proper maintenance dosage.

The ALJ also gave only partial weight to the opinions of state agency medical consultants Dr. Nieves and Dr. Umpierre, stating that they had made their analyses under "the old listing" and thus they merited only partial weight even though their opinions were in line with his findings. *Id*.

The ALJ summarized his findings regarding Castillo's RFC by noting that Castillo's treatment was not in line with what he would expect to see for a person suffering from the degree of pain and mental limitations that Castillo alleged. *Id*. The ALJ stated that the record reflected that Castillo was able to achieve stability with conservative treatment, including management via medication for her physical and mental conditions, and that the record contained limited objective findings regarding her claimed conditions, including no clear signs of neurological deficits, normal reflex findings, normal motor strength, and a relatively normal range of motion of her lumbar spine. *Id*. The ALJ also noted that objective findings reflected that Castillo was alert as well as fully oriented and that she maintained adequate memory. *Id*. The ALJ said that the record reflected that Castillo had a moderate mental condition that was treated conservatively and a physical condition that did not seem to have limited Castillo during the relevant period, and although

Castillo had hypothyroidism, there were no documented complications from this condition in the record. Tr. 264. The ALJ also believed that more aggressive treatment would have occurred if Castillo's conditions were as severe as she alleged. *Id*. The ALJ concluded by noting that there was no supported and medically confirmed opinion from Castillo's treating or examining physicians indicating that Castillo was disabled for Social Security purposes, that Castillo's testimony was inconsistent, and that although she had a severe mental impairment that somewhat eroded her ability to work, she nonetheless retained abilities that would allow her to perform employment activities. *Id*.

The ALJ then found that Castillo was unable to perform any of her past relevant work. *Id*. The ALJ noted that although the VE had testified that an individual matching Castillo's age, background, and limitations would not be able to perform any jobs in the national economy, that was a determination that was reserved for the ALJ to make, and that the VE had testified upon further inquiry that such an individual would be able to perform certain jobs. *Id*. The ALJ then said that transferability of job skills was not material in Castillo's case because under the Medical-Vocational Rules for Social Security he would find that Castillo was not disabled regardless of whether or not she had transferable job skills. *Id*.

The ALJ went on to find that there were jobs that existed in significant numbers in the national economy that Castillo could have performed through her date last insured. *Id*. The ALJ stated that Castillo's ability to perform work at all exertional levels was somewhat compromised by nonexertional limitations, but that according to the VE's testimony she would nonetheless have been able to work as a kitchen helper, a hand packager, or a salvage laborer. Tr. 265. As a result, the ALJ concluded that she could have made a successful adjustment to work existing in significant numbers. *Id*. The ALJ again noted that although the VE had suggested that Castillo might satisfy

"the grids," this conclusion was both reserved for the ALJ and not legally justified. Tr. 266. As a result, the ALJ concluded that Castillo was not disabled. *Id*. Castillo now challenges that determination.

## DISCUSSION

Castillo makes two primary arguments: first, that the ALJ should have found that Castillo's limitations were more severe when evaluating Listing 12.04's Paragraph B; and second, that the ALJ's RFC determination was flawed for a variety of reasons. Castillo then makes a variety of arguments under the headings of these two overarching arguments. I shall consider each of these arguments in turn.

Castillo first claims that the ALJ's determination regarding Listing 12.04 was inconsistent with the evidence in the record and that the ALJ merely latched on to evidence that favored his conclusions. However, there is no clear indication that this was the case. As noted above, a reviewing court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán*, 819 F.2d at 3. It is true that the ALJ's initial analysis of Listing 12.04 is cursory and that the ALJ failed to analyze Paragraph C criteria at all; on its own, this would constitute error and would not necessarily be harmless. However, within that analysis the ALJ notes several findings that Castillo references as supporting Castillo's claim, including Dr. Egozcue's finding that Castillo had poor immediate and short-term memory, Castillo's denial of ever participating in social interaction, and her denying to Dr. Egozcue that she was able to manage her own funds. Moreover, the ALJ mentions that his analysis of Castillo's RFC informed his analysis of Paragraph B (and vice versa), then goes on to evaluate Castillo's status in relation to Listing 12.04 in far more detail once the topic of Castillo's RFC is introduced, providing thorough and reasoned analysis of the record and

(particularly) of the opinions of Castillo's treating physicians. Despite the scant nature of the section expressly dedicated to analysis of the listings, the RFC section makes it clear that the ALJ considered the evidence referenced by Castillo but reasonably determined that despite this evidence, Castillo did not meet Listing 12.04's Paragraph B. As a result, I will not overturn the ALJ's conclusions regarding 12.04 on the grounds that he "cherrypicked" evidence.

Castillo also argues that the ALJ did not evaluate the effects that treatment for depression may have had on Castillo's ability to work and engage in daily activities. In particular, Castillo claims that the ALJ ignored findings made by Dr. Perez, findings that Castillo claims show that she did in fact meet Paragraph B. Unfortunately for Castillo, this is not the case. The ALJ explicitly addressed Castillo's treatment for depression, noting that it was "conservative in nature," Tr. 262, and finding that her treatment was not "the type of treatment one would expect for a person suffering from the degree of pain and mental limitation contended, as the record reflects stability with conservative treatment, including medication management for the physical and mental conditions." Tr. 263. Moreover, the ALJ discussed Dr. Perez's "findings" at length, but reasonably concluded that they merited little weight because they relied almost entirely upon subjective statements made by Castillo rather than practical examinations and because the course of treatment followed by Castillo under Dr. Perez's supervision was not consistent with Dr. Perez's findings. There is no reason to doubt the ALJ's analysis or conclusions here. As a result, Castillo's argument that the ALJ did not properly evaluate Dr. Perez's findings or Castillo's treatment for depression does not hold water.

Although Castillo correctly claims that the burden of proof shifts to the ALJ at Step Five, Castillo incorrectly argues that this means that the ALJ is required to fill purported gaps in the record regarding Castillo's treatment for depression at Step Five. This is not the case. "Although

a hearing officer has an affirmative duty to develop the administrative record, she is under no obligation to seek additional information where there are no obvious gaps in the record, and where there is a complete medical history." *Veiga v. Colvin*, 5 F.Supp.3d 169, 176 (D. Mass. 2014). Moreover, Castillo has the burden of producing evidence and proving impairments. *Ribeiro v. Barnhart*, 149 F. App'x 7, 8 (1st Cir. 2005). As the government notes, there are no obvious gaps in the record here despite Castillo's claims and no indication that Castillo's medical history is not complete. As a result, the ALJ did not have the duty to develop the record any further.

Castillo also argues that it is the ALJ's job to clarify illegible portions of the record. Castillo claims that the ALJ's failure to do so constitutes a violation of the well-established principle that the ALJ may not "ignore" evidence, but reasonably being unable to decipher what portions of the record say is not the same as ignoring those portions of the record. It is true that if a portion of the record is illegible but appears as though it would be likely to weigh significantly on the outcome of the ALJ's determination, then remand may be justified in order to obtain clarity regarding the illegible portion. *See, e.g.*, *Manso-Pizarro v. Sec'y of Health & Hum. Servs.*, 76 F.3d 15, 18-19 (1st Cir. 1996). However, if the illegible portions of the record appear to be trivial or if there is no indication that those portions of the record could alter the ALJ's determination, then there would be no need to seek out clarification. In this case, there is no need to clarify what any illegible portions of the record say, because Castillo has not explained how they would be likely to change the ALJ's determination in any significant way, and after reviewing the record as a whole there is no indication that they would do so. The subject matter of most or all portions of the record that are illegible is clearly also addressed in legible portions of the record. Moreover, the purportedly "illegible" portions of the record cited by Castillo are frequently not illegible at all, but are instead legible (mostly English language) medical abbreviations that the translator of those portions of the

record incorrectly stated were illegible. None of these portions appear at all likely to change the ALJ's opinion in any significant regard. Additionally, it is possible to tell that the remaining "illegible" portions of the record cited by Castillo are mostly made up of subjective claims made by Castillo herself and would therefore be highly unlikely to alter the ALJ's determination in any way, since the ALJ has made it clear that he does not find Castillo's subjective opinions regarding her condition to be particularly accurate or compelling. Perhaps most importantly, Dr. Ruiz, who drafted most of the portions of the record cited by Castillo, filled out a fully legible general medical report summarizing his findings regarding Castillo. See Tr. 735-37. As a result, it was not necessary for the ALJ to clarify the "illegible" portions of the record referred to by Castillo.

Turning to Castillo's second overarching claim that the ALJ's determination regarding Castillo's RFC was wrong, Castillo first argues that the ALJ relied upon his own medical judgment rather than the judgment of medical professionals in determining Castillo's RFC. Even cursory review of the ALJ's determination undermines this argument. The ALJ delves into the record and reasonably determines the weight he gives to each of Castillo's treating physicians via fully developed argumentation and citations to the record. The ALJ may not give the weight to the opinions of certain treating physicians that Castillo thinks he should, but he also explains his reasons for this in fair detail.

Castillo disagrees with the reasons that the ALJ gives for partially discounting the judgment of various medical professionals who treated Castillo, in particular arguing that it was not justified for the ALJ to conclude that because Castillo had not been hospitalized or otherwise undergone "more aggressive treatment" for her condition, Dr. Perez's opinion should be afforded little weight. However, in finding that Dr. Perez's opinion was entitled to little weight, the ALJ also noted that Dr. Perez's opinion was essentially made up of "subjective complaints documented by [Castillo's]

treating psychiatrist" and noted that the opinion was not supported by any treatment notes or mental status examinations. Furthermore, the ALJ clarified the point about aggressive treatment by stating that Castillo's subsequent course of treatment was "not what one would expect from a completely disabled person." Although it would have perhaps been ideal for the ALJ to provide slightly more clarity as to why Castillo's course of treatment was relatively conservative, certain of Castillo's other examiners (such as Dr. Egozcue at Tr. 651) made and explained similar points, and the ALJ's primary point appears to be that Dr. Perez's opinion was founded largely upon subjective complaints. As a result, any lack of clarity as to what course of treatment Castillo should have followed instead is at most harmless error, and Castillo's argument that the ALJ relied upon his own medical judgment therefore falls flat.

Castillo argues that the ALJ should have treated Castillo's statements regarding her symptoms as more credible than he did given the "*Avery*" factors, citing *Avery v. Sec'y of Health & Hum. Servs.*, 797 F.2d 19 (1st Cir. 1986). These factors include the need to gather detailed descriptions of the claimant's daily activities, functional restrictions, medication and other pain treatment, frequency and duration of pain, and precipitating and aggravating factors. In support of this argument, Castillo again claims that the ALJ merely latched on to evidence that favored his conclusions, making particular note of the idea that the ALJ ignored or elided her subjective reports of experiencing drowsiness as a side effect of her medications. As previously stated, a reviewing court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán*, 819 F.2d at 3. The ALJ references the claimant's purported daily activities, functional restrictions, medications and other pain treatment, and claimed frequency, level, and duration of pain in some detail in his opinion, and he discusses Castillo's claims of experiencing drowsiness due to her

medications at multiple points as well. However, the ALJ reasonably notes that the "intensity, persistence, and limiting effects" of Castillo's claimed symptoms including drowsiness are "not entirely consistent with the medical evidence and other evidence in the record." Tr. 262. Indeed, even Castillo's treating physicians and examiners noted that certain of her statements and actions very likely lacked credibility and consistency on multiple occasions. *See, e.g.*, Tr. 424, 651, 656-57. As a result, I find that the ALJ adequately considered Castillo's subjective statements and claims, but that it was valid to treat Castillo's subjective claims as less than fully credible.

Next, Castillo challenges the ALJ's finding that Castillo could perform jobs existing in significant numbers in the national economy on the grounds that the VE's testimony actually suggested that Castillo could not perform any such jobs. It is true that the VE initially stated that a hypothetical individual in Castillo's position could not perform jobs existing in significant numbers in the national economy. However, when the ALJ correctly clarified that the VE was not supposed to "apply the grids" (or essentially to analyze whether or not the individual was disabled) himself, but was merely supposed to testify as to whether the hypothetical individual could perform any jobs existing in significant numbers, the VE said that such an individual could perform certain such jobs.

The point of confusion may or may not have been that while the VE believed that Castillo had no transferable skills that she could use to take on another job and that this factor would preclude her from other work, the ALJ specifically found that transferability of job skills was not material to the determination of disability; the ALJ stated that this was because he would find that Castillo was not disabled whether or not she had transferable job skills. If the ALJ is correct, then the issue that caused the VE to initially suggest that Castillo could not perform any jobs existing in significant numbers would appear to be irrelevant, and the VE's subsequent testimony suggests

that she could in fact perform certain such jobs. Castillo does not challenge the notion that the ALJ properly found that she would be disabled even if she did not have transferable job skills, and there are no indications that the ALJ's analysis on this point was flawed. Regardless, I conclude that the VE's testimony supports the notion that Castillo could perform jobs existing in significant numbers in the national economy while noting that the ALJ was correct in stating that the VE is not supposed to apply the grids. As a result, the VE's initial suggestion that Castillo would be unable to perform work according to the grids is irrelevant.

Castillo also states that the ALJ did not incorporate any mental limitations into the hypothetical he posed to the VE and that the hypothetical is therefore inconsistent with Castillo's mental limitations. This is plainly false. The ALJ did in fact incorporate several mental limitations into the hypothetical that he posed to the VE. This included stating that the hypothetical individual only had the capacity to understand, remember, and execute tasks that were simple and routine; that the individual only had the capacity to make judgments related to the job that were simple and routine; that they only had the capacity to adjust to changes in simple and routine tasks; and that they would only occasionally have the capacity to interact and respond appropriately to their supervisors and members of the public. Tr. 294-95. The VE responded accordingly. Tr. 295. Furthermore, the mental limitations referenced by the ALJ appear to match up nicely with Castillo's mental limitations as the ALJ analyzed them in the ALJ's opinion. As a result, Castillo's claim that the ALJ did not incorporate mental limitations in the hypothetical is unsupported.

There is one issue that Castillo did not raise but that the ALJ failed to adequately explain that I shall briefly address in closing. The ALJ stated that Dr. Egozcue giving Castillo a GAF score of 52 was inconsistent with reporting that she had "moderate symptoms," but in fact this appears to be fully consistent. However, I hold this issue to be harmless error, as its correction appears

highly unlikely to change the ALJ's opinion. If anything, the ALJ appears to have believed that a GAF score of 52 would indicate that Castillo had worse than moderate symptoms, but in fact it indicates that her symptoms are only moderate. *See, e.g.*, *Martinez v. Colvin*, Civil Action No. 13-30124-KPN, 2014 WL 3735889, at *3 n.1 (D. Mass. July 11, 2014) (noting that "[s]cores of 51 to 60 indicate moderate symptoms or difficulty in functioning"). Furthermore, "it would be an error for an administrative law judge to focus on a doctor's assessed GAF scores, rather than the doctor's findings and opinions, to credit or discredit medical evidence," as GAF scores have apparently been deemed unreliable by the Social Security Administration. *Id*. at *3. However, the ALJ's primary reason for discounting Dr. Egozcue's opinion that Castillo had schizoaffective disorder appears to be that he found it inconsistent with his other general findings that he made in his examination. Castillo does note that the GAF score of 52 is not far removed from the GAF score of 50 found by Dr. Perez, which is just over the threshold for indicating more severe symptoms, but she could just have easily have said that Dr. Perez's score is close to Dr. Egozcue's moderate finding. As a result, I find that the ALJ's seeming misinterpretation of Castillo's GAF score is harmless error.

## CONCLUSION

For the foregoing reasons, the ALJ's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 25th day of May 2022.

S/ *Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge